FILED

2006 Mar-24  PM 03:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
<u>WESTERN DIVISION</u>

| | |
|---|---|
| KENNETH R. HALL, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 03-PWG-1089-W |
| | ) |
| ALABAMA DEPARTMENT OF MENTAL | ) |
| HEALTH AND MENTAL RETARDATION, | ) |
| ET AL., | ) |
| | ) |
| Defendants. | ) |

<u>MEMORANDUM OF DECISION</u>

Kenneth R. Hall, M.D., a Caucasian male, initiated this civil action with a complaint alleging

violations of Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991,

codified as 42 U.S.C. § 2000e *et seq*. ("Title VII") and 42 U.S.C. § 1983.  (Doc. #1).  Hall, an M.D.

and licensed psychiatrist, named as defendants Bryce Hospital, an employer, the Alabama

Department of Mental Health and Mental Retardation (hereinafter "Department"), and individual

defendants Kathy E. Sawyer and David E. Gay, Jr.[1/]

The complaint alleged that beginning in April 2002 through the date of the complaint, Hall

had been subject to "... disparate terms and conditions of employment ... with respect to having to

work in a racially hostile work environment."  The complaint alleged that the "defendants" violated

Title VII by intentionally discriminating against plaintiff on the basis of his race with respect "...to

hiring, transfers, promotions, disciplinary action and other terms, conditions and privileges of his

---

[1/]    The complaint also alleged that certain other unidentified defendants A, B, and C had violated the plaintiff's
federally protected rights.  As fictitious party practice is impermissible in the United States District Court these
unnamed defendants are due to be dismissed.  Moreover, the plaintiff never amended his complaint to add
additional defendants.

employment."  He also alleges in the count captioned as "Title VII" that the defendants have interfered with his ability to obtain alternative employment because of a "reprimand."  The plaintiff alleges in count two of his complaint that "the defendants," presumably including the individual defendants, violated his Fourteenth Amendment due process and equal protection rights by "... wrongfully initiating investigations against Dr. Hall for unwarranted reasons, by violating their own policies, regulations, by-laws, rules and procedures during these investigations, and by violating Dr. Hall's due process and equal protection rights during these investigations."  (Doc. #1, p.8, ¶ 32).  Plaintiff asserts that the individual defendants acted as the final policymakers when they discriminated against the plaintiff and the Department and Bryce Hospital are liable for their action under § 1983.  The complaint alleges that Gay and Sawyer intentionally discriminated against Hall "... on the basis of his race" in violation of the Fourteenth Amendment due process and equal protection rights.  ( *Id.*, p.9).

In an amended complaint Hall asserted that the defendants "made the environment at Bryce Hospital so hostile that employees who were not African American resigned their employment" (doc. #20, p.6) and that the defendants knew or should have known about the hostile environment but condoned or allowed the environment to exist.  *Id*.  The complaint also asserted that "the defendants have given preferential treatment to African American employees to the harm of Caucasian employees...."  Plaintiff asserts that the Department and Bryce Hospital had a custom or policy of tolerating racial discrimination against Caucasian employees.  The amended Title VII claim averred that the plaintiff was discriminated against on the basis of his race with respect to disciplinary actions and "harassed on the basis of his race."  The § 1983 claim asserts that Gay and Sawyer wrongfully initiated an investigation against the plaintiff and improperly denied a hearing or appeal "in violation

of their own policies,..." (Doc. #20, p.9).  He asserts individual liability under § 1983 lies with Gay and Sawyer.  He also alleges that the Department and Bryce Hospital are liable under § 1983 for the misconduct of Gay and Sawyer.  (Count three).  The complaint asserted that non-Caucasian employees "... received more favorable treatment, more favorable compensation, no or less severe disciplinary action and non-Caucasian employees [   ] ... have not followed or complied with the policies and procedures of the defendants, including but not limited to, policies and procedures regarding attendance, treatment of patients, and relationship with co-employees." ( *Id.* at doc. #11). At what is also captioned count III, although numerically is count IV of the complaint, plaintiff asserts a claim under 42 U.S.C. § 1981 contending that the defendants have intentionally discriminated against the making, performance, modification and termination of his contract of employment. ( *Id.* at pp.12-13).  The amended complaint without demarcation makes Title VII and § 1983 disparate treatment claims, Title VII and § 1983 hostile work environment claims and procedural due process claims.

The defendants have filed a motion for summary judgment (doc. #57, and attachments). Plaintiff has filed an opposition to the motion (doc. #61) and evidentiary submissions (doc. #62). Defendants have filed a reply to plaintiff's opposition (doc. #64) and plaintiff has filed a response in opposition to the reply (doc. #66).  The matter is before the undersigned pursuant to the provisions of 28 U.S.C. § 636(c), the parties having consented to dispositive jurisdiction.  (See docket entry #8 and order at doc. #9).  The action had earlier been before the undersigned magistrate judge pursuant to the provisions of 28 U.S.C. § 636(b); Rule 72 of the *Federal Rules of Civil Procedure*; LR 72.1; and the General Orders of Reference dated July 25, 1996, May 8, 1998, as amended July 27, 2000.  The parties do not contest subject matter jurisdiction.

3

Factual Background[2/]

In October of 1996 Kenneth Hall was hired as a psychiatrist II by the Department of Mental Health. He was assigned to a unit identified as One-North at Bryce Hospital. (Doc. #62, exhibit 5, attachment, Hall's depo., pp.92-93). During his tenure at Bryce Hospital, Hall was supervised by Dr. Travis Nobles, also a white Caucasian male. *Id*. During his tenure, Hall was assigned to the first floor of the One-North unit.

For at least one year preceding Dr. Hall's resignation it was widely known that the One-North unit was scheduled to be closed. (Hall deposition, pp.96-97, 149). Prior to his resignation Hall acted in the capacity of "Service Chief," a designation assigned by Dr. Nobles. Although he was told by Nobles that he would hold the title, Hall performed no supervisory tasks such as conducting employment evaluations of other physicians. Hall did not recall whether he had ever received an "official" assignment. (*Id*., pp.97-98). At some point Nobles had also indicated a desire to appoint Hall as the "number two" in the psychiatry department although Hall acknowledges that the position never became available. He testified there was no promotion to apply for and he never actually sought such an appointment. (*Id*., pp.151-152). At the time Hall tendered his resignation in July of 2002 there was only one African American psychiatrist at Bryce. (Hall depo., p. 148). Despite that fact Hall contends that his white supervisor, Dr. Nobles, told him at some time prior to April 2002 "... that there was a blackening of employees of Bryce Hospital." (*Id*., p.258). Hall also avers that Nobles had said at some unspecified point that "... white psychiatrists were an endangered

---

[2/]    As this matter proceeds pursuant to the provisions of Rule 56, *Federal Rules of Civil Procedure*, the facts as set out in this order are either undisputed or construed in the light most favorable to the plaintiff. *Adickes v. S. H Kress & Co.* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.2d 1278, 1285 (11th Cir. 1997).

species." ( *Id*., p.275).[3] It is undisputed that in the spring of 2002 Dr. Hewitt Ryan, a white male psychiatrist, was transferred from Bryce to the Harper Center. (Gay depo., p.97; Plaintiff's exhibit 3). At some point after April of 2002 Dr. Patrice Donahue, a white female psychiatrist assigned to unit Two-North, was transferred to the infirmary and resigned on June 28, 2002. (Hall at p.193).[4] It is also undisputed that with the potential closing of One-North, both patients and staff were frequently transferred and/or reassigned in the Spring of 2002. (Hall depo., pp. 102 177-178 and 192). Hall recognized in that period with the closing of One-North he too would be transferred or reassigned. ( *Id*.)

The seminal incident which gives rise to this litigation occurred on April 2, 2002.[5] The triggering event was the product of the aftermath of a scheduled Treatment Planning Conference (TPC) held on that date to consider a care plan for a patient suffering from advanced Huntingtons Chorea. The patient, identified as T.W., had been admitted to the facility in late 2000 after a number of suicide attempts presenting with hallucinations, depression and suicidal ideation. (Doc. #62, plaintiff's submission in opposition to summary judgment, exhibit 1, Hall aff., pp.2-3). The group

---

[3] Indeed as of June 28, 2004 there were only two black physicians at Bryce. (Gay depo., plaintiff's exhibit #3 at p.99). The number of white physicians at all times had exceeded the number of black physicians. ( *Id*., pp. 98-99. See also plaintiff's submission (doc. #41, exhibit 2, deposition of May Thomas there was only one psychiatrist in June 2004)).

[4] There is absolutely no evidence to suggest that racial discrimination or hostile work environment was relevant to Dr. Donahue's decision. (See e.g. Hall depo., p.245).

[5] Indeed, Hall's initial complaint which alleged a racially hostile work environment specifically stated that he was subject to such hostility from April 2, 2002. Hall's last day of work was June 27, 2002. (Hall depo., p.274). In his amended complaint Hall incorporates what he identifies as acts of disparate treatment involving other white employees without ever suggesting a hostile work environment affected anyone. He does not allege that prior to his lawsuit he had any personal knowledge of the occurrences he has included in his amended complaint related to other white employees and events that took place before April 2, 2002. Moreover, he makes no factual allegation related to a hostile work environment prior to April 2, 2002 involving any white employee. These factual allegations seem to implicate disparate treatment of other white employees while Hall's disparate treatment claim evolved from his own disciplinary action and subsequent counseling although he also complains he was denied a four day work week.

attending the TPC was to address, *inter alia*, a Do Not Resuscitate order (DNR).  To adopt a DNR

is a significant decision.  The participants of the TPC included Hall; T.W.'s parents; Milton Davis,

a psychologist; Laura English, social worker; a nurse; Connie Miles, an activity therapist; and mental

health workers Rosa Burns and Elaina Lewis.  (Doc. #62, exhibit 1, p.3).  It is undisputed that Elaina

Lewis and Rosa Burns reported to the members of the committee and later to others that T.W. had

refused to attend the meeting and would not be coming.  (Doc. #58, exhibit #10, p.41).[6] According

to Hall's affidavit "T.W. [had] told [him] that she wished to attend the treatment planning

conference...." (Doc. #62, exhibit 1, p.7).[7] Hall and a psychologist associate, Milton Davis, left the

meeting and walked to the ward or day room to see T.W.  It is undisputed that other patients were

in the day room when Hall and Davis entered.[8] Hall has testified that as a psychiatrist he was the

---

[6]     Hall does not dispute these reports.  Hall testified that he did not remember what was said when the mental
health workers spoke to the committee participants with respect to T.W.'s attendance.  He has stated only that
"they said that the patient wasn't going to be coming.  I don't remember the words they used.  But some
inference was made, to the fact that [T.W.] would not be there."  (*Id*., see also plaintiff's doc. #41, exhibit 5,
Hall depo., p.129 in which Hall reviewed his testimony from the September 3, 2003 hearing and affirmed that
his unsworn statements made in that proceeding were accurate).  It is undisputed that Lewis and Burns reported
that after they had dressed T.W. the patient had given them some sign which they interpreted to mean that she
did not want to go to the meeting.  (Plaintiff's doc. #41, exhibit 2, pp.13-14).  It is also undisputed that after
reviewing the investigator's report an Investigation Review Panel found on April 20, 2002 that there was
sufficient evidence to conclude that T.W. had refused to attend the meeting.  (Doc. #58, exhibit #17).  Neither
Hall's testimony nor his evidentiary challenge addressed elsewhere in this order contradict the evidence before
that panel.

[7]     The only inference which can be drawn from Hall's affidavit is that sometime before Lewis and Burns dressed
T.W. for the purpose of attending the meeting the patient had communicated to Hall that she wished to attend
the meeting.  Hall's affidavit does not make clear whether that communication was made on the same day or
some other day.  It is clear, however, that T.W. never "told" Hall that she wanted to come to the meeting after
Burns and Lewis reported that T.W. would not be coming.  His affidavit states only that when he went to the
day room to see T.W. "[... he] received no communicative response and no indication of refusal to attend the
treatment planning conference ...." (Doc. #41, exhibit 1, p.3) (emphasis added).  Indeed Hall's statement at his
September 3, 2002 hearing is even more equivocal about what T.W. "told" him on April 2, 2002.

[8]     Without elaboration Hall dismisses the presence of other patients as individuals "not competent" to understand
anything they may have seen or heard.  (Doc. #41, exhibit 1, p.3).  The conclusion to be drawn from Hall's
affidavit is that of all of the patients in the ward with T.W., only T.W. was competent to "understand what [was
going on] or make a judgment."  (*Id*.).

only person in the ward or attending the TPC capable of determining whether T.W. was "competent" to attend the meeting.[9/] Hall maintains that when T.W. did not appear to him to refuse to go to the meeting, he and Davis either picked up the couch on which the patient was seated or dragged it out of the day room, through a locked door, down a corridor to another locked door into a second small corridor and into the conference room angling the couch so that it could be put inside the conference room.  (Doc. #58, exhibit 10).  Hall believed that T.W. was so lacking motor skills that she could not walk but merely stumbled about and because of her lack of body control was markedly unstable. Despite Hall's knowledge of T.W.'s physical impairments the patient remained perched on the couch while it was carried or dragged by Hall through the facility.  Hall also had knowledge that T.W. had walked with assistance of staff members in the past and that she had been moved in wheelchairs. He asserts in his affidavit that he and Davis chose to carry or drag both T.W. and the couch out of a concern for her safety.  *Id*.  Hall claims that because he had not done a lot of manual labor and was not "real strong" he believed that if he and the other grown man had attempted to lift the 155 pound patient into a wheelchair they would have risked dropping her.  He stated that he did not ask for help from any other staff member but that he, apparently in the interest of the patient's safety, elected to carry or drag the 155 pound patient and the couch through the locked doors, down the corridors into

---

[9/]     Hall makes much of this contention devoting substantial time in depositions and reams of paper in other pleadings in support of this uncontested and ultimately irrelevant point.  The issue before the review panel, David Gay, and the director of the Department of Mental Health, was not then and is not now as it appears before the court whether, as a psychiatrist, Hall is more qualified to determine such questions than nurses, mental health workers, psychologists, activities coordinators or indeed this court.  He is, but that does not matter.  He does not argue there is a special skill needed to determine whether someone has exhibited a refusal to do something.  He does not contradict the accuracy of what Burns and Lewis reported.  The specific charge made against Hall was not that he erroneously concluded that T.W. was competent to attend the TPC but that his conduct endangered T.W. in the demeaning manner in which he chose to transport her to the TPC.  Hall's personal opinion that T.W. "consented" to being carried on a couch was entitled to no greater consideration than the testimony of any other witness at the September 2002 hearing.  The question was resolved against Hall after a September 5, 2002 hearing.

the conference room rather than use a wheelchair.  As they transported T.W. in this fashion, Hall and

Davis were seen by Joe Stringer, an African-American male, the director of the One-North unit.  *Id*.

It is undisputed that Stringer informed Kim Sturdivant, a white female patients advocate,

about the incident.[10]/  On April 3 Kim Sturdivant prepared a memorandum to David Gay, the director

of the Bryce Facility and Dr. Ron McCarver, the risk management specialist, requesting an

investigation into potential mistreatment.  The memorandum read:

> I am writing to request a hospital investigation into alleged
> Mistreatment of a patient, on One-North first floor.  Allegedly, on
> 4/2/01, Dr. Kenneth Hall, psychiatrist, and Mr. Milton Davis,
> psychologist, dragged [   ] from the day area on a couch to a meeting
> room for TPC, she was laying down and refused to attend the
> meeting.  [   ] has the right to refuse to attend a meeting if she so
> desires and dragging her from the day area in front of co-patients and
> staff constitutes active intimidation and the badgering of a patient per
> the Alabama DMHR-MR policy regarding [sic] abuse and neglect,
> 19-10.  The cruelty allegedly demonstrated by professional staff is
> appalling to me and it is the definition of Mistreatment.  The meeting
> that was being held was of no use anyway, as the legal guardian was
> not there to discuss DNR orders and the family has no standing to
> make the decisions regarding the order since [     ] has a legal
> guardian!  Therefore, there was no reason  for the patient to attend the
> meeting in the first place.
>
> I spoke with Milton Davis this morning, 4/3/01, and he admits that he
> did assist Hall in dragging the patient from the room on a couch.  He
> also stated that he saw nothing wrong with this action and he has no
> understanding that the meeting was useless any way (as far as the
> DNR order determination) as the legal guardian was not making the
> DNR order decision!  Please have the BHPD investigate this matter
> promptly, thank you for your protection of patient's rights at Bryce
> Hospital.

(Exhibit #58).

---

[10]/    The Rights and Advocacy Program was established under Department of Mental Health Policy 18-1 DMHR-MR to safeguard resident's rights and, in short, their safety.

In his affidavit though not in his deposition, Hall contends that earlier in March of 2002 Ms. Sturdivant had become angry with him and threatened to "get him" on a right's violation.[11] After receiving Sturdivant's request, Gay authorized an inquiry by the Bureau of Special Investigations into the allegations of patient abuse.  (Doc. #58, exhibit 15, Gay depo., p.69).  Mary Thomas, an African American female investigator for the Bureau of Special Investigations, with more than thirteen years of experience, was assigned to investigate the allegations made against Hall and Davis. (Doc. #41, plaintiff's evidentiary submissions, exhibit 2; Thomas depo., pp.50-51).  On April 3, 2002 Thomas interviewed Hall.  Hall has alleged that Thomas was rude.[12]  In addition to Hall, Thomas interviewed Kim Sturdivant, the patient advocate, mental health workers Rosa Burns, Elaina Lewis, RN Elana Jenkins, Connie Miles, Laura English, and Milton Davis the psychology associate. (Thomas depo., p.10).  According to Thomas, Burns stated that T.W. had given "... them some sign that 'no,' she [T.W.] didn't want to go."  ( *Id*. at p.14).  Burns, according to Thomas, then enlisted a registered nurse by the name of Lewis (sic) to attempt to encourage T.W. to go to the meeting.[13] Thomas reported that Connie Miles was present in the conference room when Hall and Davis returned with T.W.  Neither Miles nor English were ever present in the day room.  They remained

---

[11]   It is unclear how Ms. Sturdivant's alleged motivation supports Dr. Hall's allegations of a racially hostile work environment.

[12]   Q:   O.K.  What is it that you base that on, why do you believe it was racially motivated?
        A:   The incident – the alleged incident occurred on April 2.
        Q:   Uh-huh.  (affirmative).
        A:   The following day I was very rudely approached and apparently was already found guilty by the investigator who was investigating me.
        Q:   Uh-huh.  (affirmative).
        A:   She was black.  She asked me questions which in a sense can't be answered without being wrong or guilty.  Attempts to clarify for her what had occurred were not listened to.  At the end of the conclusion of the interview, which she taped, I indicated I wished to review her report before it was submitted to any committee because I felt she was going to get some information in there wrong.
        (Hall depo., at pp.136-137).

[13]   As noted, the investigator interviewed RN Elana Jenkins.  In her deposition testimony, Thomas said that the mental health techs had asked an R.N. by the name of Lewis to talk to T.W.  It appears that Jenkins was the nurse in the ward on April 2.

in the conference room with T.W.'s parents.  (Thomas depo., at pp.20-21).  Thomas submitted her report to Gay.

On April 17, 2002 Thomas also attended a meeting held later in the west conference room of the facility of an Investigation Review Panel attended by Ron McCarver, Ph.D.; Kim Sturdivant, Ph.D.; Mary Snider, RN; Christy Raney; Joe Stringer; Dr. Tompkins; John Toppins, Ph.D.; and Dr. Travis Nobles.  Thomas presented her report to the committee members and a recommendation was submitted to the director.  (See doc. #58, defendants' exhibit 17).  The minutes of the investigation review panel reflect that the panel concluded that an administrative action limited to counseling sessions for Dr. Hall and Mr. Davis to be conducted by their respective supervisors was required. The minutes ended with the notation

|  |  |  |
|---|---|---|
| **Disciplinary Action** |  | **X yes** |
| 1. | Dr. Kenneth Hall | written counseling for violation of DMH/MR policy 19-10 for mistreatment. |
| 2. | Mr. Milton Davis | written counseling for violation of DMH/MR policy 19-10 for mistreatment. |

(Defendants' exhibit 17).[14]

---

[14] The conclusion of the Investigative Review Panel was that the evidence as presented in this investigation report indicates that "on 4/20/[sic] 02 a TPC was being held for patient, [  ].  Her parents and the Treatment Team convened in the TRU conference room. [  ] after being dressed by MHW, Rosa Burns indicated by shaking her head, 'no,' when asked to attend the meeting. Ms. Burns informed her supervisor, Elaina Lewis, MHW II who attempted to persuade [  ] to attend the meeting but she continued to refuse. Ms. Lewis went to the conference room and informed Dr. Hall that [  ] was refusing to come to the TPC.  According to Ms. Lewis, Dr. Hall said 'we'll see about this,' and then he and Milton Davis went to the day room.  According to Ms. Burns who was still with [  ] Dr. Hall asked [  ] if she would attend and she still refused.  Dr. Hall and Mr. Davis stated that [  ] did not respond. Dr. Hall then asked for a wheelchair but [  ] refused to get off the couch. At that point, Ms. Burns stated that either Dr. Hall or Mr. Davis said something like, 'if Mohammed will not come to the mountain ... then we'll just take her to the TPC,' and they drug [sic] the couch through the day area, down the hall by the dining room into the conference room. [  ] did not resist this and when offered candy in the room did participate somewhat in the discussion about a possible DNR order in her record." (Defendants' exhibit 17).

On April 23, 2002 David E. Gay in his capacity as facility director wrote Dr. Hall concerning the results of the investigation by BSI.  The letter which was forwarded to the investigative file, Hall's supervisor and Joe Stringer, the acting unit director of One North stated:

> The investigation regarding the allegation of patient abuse against you has been completed.  The results of the investigation indicate the allegations are substantiated.

(Plaintiff's doc. #62, exhibit 23).

On May 3, 2002 Hall presented a signed facility complaint form to Nobles, his supervisor, in which he challenged the "substantiated" allegation of patient abuse calling the charges absurd.  He referred to the letter he had received May 1, 2002, dated April 23, 2002.  He requested that Nobles provide him with "a clearly defined statement of charge against me – I want to receive a copy of interviews by investigator (taped) – I want to receive complete reports by investigator (I had requested of investigator at time [sic] of interview the right to review and contest statements from an interview before submission to any committee) and correct any errors or admissions – I request a review of the charges with my supervisor and an apology."  (Plaintiff's exhibit #16).

A letter dated May 31, 2002 signed by Dr. Travis Nobles, M.D., counseled Hall to "familiarize [himself] with [the policy prohibiting patient abuse, DMH/MR policy #19-10] and understand that continued violations of this nature will result in stronger disciplinary action."

(Defendants' exhibit #19).[15/] Hall contends that when Dr. Nobles gave him the counseling letter, Nobles "indicated" that he had not written it. (Hall depo., pp.125-126).[16/]

On June 7, 2002, after receipt of the counseling letter, Dr. Hall again complained to Nobles requesting a clearly defined statement of the charges and that the process begin with his supervisor. Dr. Nobles acknowledged receipt of the complaint on the same day, June 7. (Defendants'

---

[15/]   The text of the letter read:

> Dear Dr. Hall:
>
> The purpose of this letter is to counsel you for violation of DMH/MR policy #19-10 Reporting and Investigation Abuse, Neglect, Mistreatment and Exploitation specifically III, 6 "Mistreatment."
>
> On April 2, 2002, a patient on TRU-1 North would not attend a Treatment Planning Conference in the 1 North conference room. When you were notified that the individual would not attend the TPC, you and a psychological associate went to the day area where the patient was lying on a couch. The two of you moved the couch with patient lying on it through the day room to the conference room in front of other patients and staff. Subsequently, the incident was investigated and the findings substantiated that DMH/MR policy #19-10 as stated above had been violated.

*Id.*

[16/]   The counseling letter was also signed by David Bennett, the Human Resources Director. Bennett's signature was dated June 7, 2002. Hall testified that:

A:      And while it was presented to me by Dr. Nobles, he indicated that he had not written this letter. (Hall depo. at p.126).

        . . . .

Q:      O.K.

A:      I believe that letter was presented to me by Dr. Nobles, while at the same time telling me that he had not written that letter.

(*Id.*, at p.127).

It appears from the members of the Investigative Review Panel that Nobles, who was deceased at the time of Hall's deposition, had attended the meeting at which Ms. Thomas's report had been presented and discussed. Hall did not testify in his deposition nor state in his affidavit that Nobles ever disavowed the contents or conclusions of the letter. Hall did not testify that Nobles indicated that he disagreed with the findings. Hall cites a single page of Nobles's statement of the September 5, 2002 Step 3 hearing in which Nobles makes clear he attended the Investigative Review Panel meeting but "as an observer." Nobles also said that he did not "review" the investigation himself although he heard the report and discussion. (Plaintiff's exhibit #17). Accepting as true that Nobles did not "write" the letter is the full extent of any inference that can be drawn from Hall's recitation of the comments of the deceased supervisor.

submission #58 at exhibit 22).  On June 19, 2002 Hall filed a third complaint with Dr. Nobles which

included the statement of his complaint in the language set out in the June 7 request.  That statement

provided

> Accusations of abuse, mistreatment, intimidation, coercion, unnecessary force, and humiliation are untrue, unfounded, unprovable, insulting, slanderous, interfering with my relationships with patients, and interfering with my business relationships. Furthermore, the "investigative process" is unfair, violative of policies and procedures and violative of my due process rights.

( *Id*. at exhibit 23).

On July 7, 2002 Hall submitted a fourth complaint which was received by a representative of the

personnel director of Bryce.  The fourth complaint included the same factual statement of claim. (*Id*.

at exhibit 24).  On July 8, 2002 Hall submitted his letter of resignation to Dr. Nobles. The text of his

letter stated that

> Please accept this letter as my formal resignation of employment at Bryce Hospital and the State of Alabama Department of Mental Health and Mental Retardation.  Due to the improper treatment I have received, the interference with my treatment of patients and attempted intimidation, the work environment has become so hostile as to require my resignation.  In no way do I forfeit my rights and hereby specifically reserve my rights to continue in the process, both administrative and otherwise, of clearing my reputation and disproving the slanderous statements that have been made against me. No amount of intimidation or harassment will coerce me into treatment that is not in the best interest of my patients.  For these reasons I formally submit my resignation effective August 2, 2002.

(Doc. #58, exhibit 27).[17]

---

[17] No mention of a racial discrimination was made in the resignation nor did Hall recount that Nobles had indicated there was nothing to be done about such allegations.

Hall complains that after the April 2, 2002 incident his medical judgments were challenged by Joe Stringer, the African-American unit director of One-North. Hall testified that on June 5 or 6 of 2002, a patient reported to Hall that the patient had been denied privileges.[18] Hall reported what he believed to be a denial of a patient's right to such privileges to Joe Stringer and later to a patient advocate named Virginia Cook. Cook reported to Hall that according to the administration the patient was to be escorted to activities when staff was available. Hall was unsatisfied with the response and spoke with Cook again. On June 6, 2002 Stringer approached Hall in a nurse's station and told him that "David Gay is pissed at you. He wants to let you know he doesn't work for you and he's not going to take any further messages from you through Virginia Cook. If you have any complaints about the way he's running Bryce Hospital, you report to his office." (Halls' depo. at pp.270-71). Hall believed that Stringer's statements were "demeaning." *Id.*

Hall also contends that he was subjected to a racially hostile work environment because his medical decisions and orders regarding the transfer of patients were not followed after April 2, 2002. In one such example Hall states that "... in a spirit of cooperation, ... he ordered a patient transferred to ... Two-North as Bryce was preparing to shut down One-North." (Hall's depo., p.177). He was told by One-North Unit Director Joe Stringer that the patient would not be transferred. ( *Id.*, p.178).[19] On other occasions, according to Hall, administrators transferred patients to other parts of the facility without consulting him or asking for his opinion. (Doc. #62, exhibit 5, pp.178-79,

---

[18]    The patient is identified by the initials R.T.

[19]    Hall did not testify that the transfer was medically required only that it was ordered because of the potential closing of One-North.

183-84, 259).[20] Hall avers that after he refused to transfer a patient at Stringer's request he was directed to appear at a meeting with David Gay. (p.187). Those attending the June 27, 2002 meeting were Hall's supervisor, Dr. Nobles, David Bennett, the Human Resources Director, Joe Stringer, Gay and Hall. (p.190). Hall states that Gay told him that the administration would work with Hall and expected Hall to work with them. According to Hall, Gay told him that if Hall would not work with the Bryce administration "... you need to find a job elsewhere." ( *Id*., p.191). This meeting marked Hall's last day at Bryce in an official capacity.

Hall's only other example of what he terms a racially hostile work environment related to a four day work week granted to an African American female physician assigned to Two-North during Hall's tenure at One-North. Hall testified that when he was hired by Bryce in 1996 he asked Dr. Nobles for a four day work week and was told by Nobles that "Bryce no longer offered a four day work week." (Hall's depo., pp.140, 142). At some later time an African-American female psychiatrist, Dr. Verona Lawson, who had been assigned to the Taylor Hardin Secure Medical Facility came to work at Bryce on Two-North. Shortly after Dr. Lawson came to Bryce she was granted a four day work week. (Hall depo., p.143). Hall does not state who granted the request nor the circumstances upon which the decision was made. Hall stated that after he learned of Lawson's work schedule he asked Nobles for a four day work week as well. (Hall depo., p.143). According to Hall Nobles did not authorize a four day work week and told him that there was no point in

---

[20]   Hall was extraordinarily vague in identifying the number of such occurrences. While testifying there to those set out above, he stated that he did not want to "commit to a number" and would agree only that such occurrences were "less than 100." There is no evidence of specific examples but for the three occasions referred to in Hall's deposition.

making a written request for one. (Hall depo., p.144).[21] There is no evidence that Hall asked any one

other than Nobles for such a privilege.

<u>Administrative Procedural History</u>

Dr. Hall retained attorney Brandy Lee sometime between May 3 and June 7, 2002. (Hall

depo., p.135).[22] The Department of Mental/Mental Retardation provides all employees with a

standardized procedure through which they might seek resolution of complaints.   A written

reprimand which becomes a permanent part of an employees personnel file is an appropriate subject

for an employee complaint. (Defendant's exhibit 5, policy no. 60-102; III.1(d)).  Under the policy,

a complaint is filed first with the immediate supervisor, in this case Dr. Travis Nobles.  In the event

an employee's complaint is not resolved by the immediate supervisor, the procedure under

DMH/MR 60-102 calls for a "Step 2" proceeding before the department personnel director, Mr.

Bennett.  Dr. Hall's complaint was forwarded directly to the facilities director to proceed under "Step

3."[23]  The regulations provided that an employee is entitled to present a list of employee witnesses

to the personnel director in order to secure the presence of employee witnesses.  Following the

hearing, the appropriate official, in this case David Gay as the facility director, is required to enter

a written decision.  In the event that the complaint is not resolved at Step 3 the affected employee

may request a Step 4 hearing by providing notice to the Commissioner of the Department of Mental

---

[21]     Hall also complains that Lawson was granted a transfer from Two North to the admissions department although
he does not contend that he ever requested a transfer or that such a request was denied.  (Hall depo., p.145).

[22]     Q:     At what point did you retain Brandy Lee to assist you with this?
          A:     I don't recall the date.  It would have been after I completed the first complaint form and prior to the
                 second complaint form.
          (Hall depo., p.135).  The first complaint form was dated May 3, 2002 and received by Dr. Nobles on May 6,
          2002.  (Doc. #58, defendant's exhibit #20).  The second complaint form was signed by Hall and received by
          Nobles on June 7, 2002.  (<i>Id</i>., at exhibit #22).

[23]     Bennett had signed the May 31, 2003 counseling letter along with Nobles.

Health and Mental Retardation, Cathy Sawyer.  The Commissioner may designate a hearing officer to conduct a proceeding.  After Hall's resignation, a hearing was held on September 5, 2002 with David Gay as presiding officer.  Hall submitted a list of witnesses he wished to be heard.  (Hall depo., p.130).  Among others, Hall had requested the appearance of Laura English and Dr. Hewitt Ryan.  ( *Id*.)  Although all other witnesses requested by Hall were present, English and Ryan were not.  It is undisputed that by the time of the hearing on September 5, 2002 English did not work for the Department of Mental Health and had in fact left the state of Alabama.  (Hall depo., p.166).[24] Although English was not present Hall testified that he had previously asked her "... if she would write down a statement as to her impression of what had occurred on the day in question...."  *Id*.  Hall does not dispute that the statement he obtained from English was made a part of the record at the Step 3 meeting,  (*Id.,* p.166).  Dr. Hewitt Ryan was not present at the Step 3 hearing.  Dr. Ryan was not a witness to the events of April 2, 2002.[25] After considering the evidence including the statements of witnesses summoned by Dr. Hall as well as the statement of Laura English.  At all times during the hearing Hall was represented by counsel.  His attorney examined all witnesses she chose to examine.  (Doc. #58, exhibit 28).

David Gay issued a finding on September 23, 2002 that Hall had violated "hospital policy 19-10, III, No.6, Mistreatment...."  Mr. Gay concluded that he was in agreement with the written counseling provided to Hall on May 31 by Dr. Nobles.  Following the Step 3 decision, Hall sought an administrative hearing before the commission or her designee.  On October 8, 2002, Cathy E.

---

[24] Hall contends that had he been afforded a Step 3 hearing in a timely manner English would have been available.  There is no evidence of when English left the Department.

[25] Hall has contended at various times that the administrative hearing within the Department violated his rights as a physician.  He has asserted that the appropriate forum for a review of his conduct was a medical peer group chaired by Dr. Ryan.

Sawyer, the Commissioner of the Department of Mental Health and Mental Retardation, requested attorney June Lynn to serve as a Department hearing officer and schedule a hearing on Dr. Hall's appeal within thirty days. (Defendants' exhibit #29). On October 16 Lynn confirmed a hearing date of October 31, 2002 at Bryce Hospital with Hall's attorney Brandy Lee and an attorney for the Department. (Defendants' exhibit #30). The hearing was continued and rescheduled.[26] After Hall initiated this civil action in May of 2003, the hearing officer concluded that a Step 4 hearing was inappropriate pending the outcome of this civil action. (Doc. #58, defendants' exhibit #33).[27] It is undisputed that the Department has not conducted a Step 4 hearing.

Dr. Hall's Additional Claims–Additional Evidence

In his response to the defendants' motion for summary judgment, Hall contends that white employees "Gene Lawson, Truman Hocutt, Amy Marable and Dr. Dante Gamboa are white employees who were <u>wrongfully</u> charged with patient abuse, investigated and disciplined." (Plaintiff's opposition to defendants' motion for summary judgment, doc. #61, pp.35-36) (emphasis added). In his affidavit, Hall recites events which took place prior to April 2, 2002 in contending these white employees were wrongfully singled out. (Doc. #62, exhibit 1). Hall makes no claim that he had ever heard of these occurrences before his lawsuit was filed. In the context of his allegation of a racially hostile work environment, Hall's deposition testimony clearly establishes that he was

---

[26]    The defendants contend that the hearing was continued at Dr. Hall's request. Dr. Hall has not disputed that assertion. Moreover, it is apparent from the records that Hall several times insisted on holding a hearing on weekends or in the evenings. The hearing officer declined to conduct a hearing under those circumstances noting among other things that Bryce employees were available only during their working hours. (See e.g., doc. #58, exhibits 31 and 32).

[27]    At various times Hall has chided the Department for failing to hold a Step 4 hearing although he does not dispute that the hearing was initially scheduled for October 31, 2002 and continued at his request for various reasons. He also does not dispute that the instant action is related to his Step 4 hearing.

unaware of any of the events referred to in his affidavit prior to his own resignation.  (See e.g., Hall depo. at pp. 204, 213-14, 225-27 and 222-223).  In the context of his disparate treatment claim, Hall can only state that he was personally unaware of any black employee disciplined for patient abuse. Hall does not dispute facility records reflecting that in 2002, 205 black employees received written counseling while only 30 white employees received such counseling.  (Doc. #58, exhibit 1, Bennett aff., p. 2).[28/]  Despite an opportunity for complete discovery Hall has tendered no evidence that any black employee regardless of the position held had committed an act of patient abuse and was not punished in the same or similar manner as that of a similarly situated white employee.

In the context of disparate treatment Hall also alludes to an alleged disparity in pay scale suggesting that Dr. Cynthia Moore-Sledge, a black female, was hired at the top of the scale, a salary comparable to that of Dr. Elizabeth Ruben, a white female with 15 years of experience.  Hall does not, however, offer any evidence of the relative qualifications of either.  Hall alleges that Dr. Andrea Ohldin, a black female, was allowed to remain on the employment roles despite not working.  Hall does not however suggest, let alone offer evidence, that such an opportunity was denied to any identified white employee.  Hall contends that Ohldin was hired as the Clinical Director of the Harper Center while Hewitt Ryan, a qualified psychiatrist, was denied this position.  Hall's contention that Dr. Ohldin was unqualified rests exclusively on his personal conclusion that Dr. Ohldin was unqualified because she was not a psychiatrist.  Hall does not provide any evidence from which an assessment can be made of the qualifications of Ohldin and Ryan with respect to the directorship.  Finally, Hall makes a general assertion that black employees were hired to positions

---

[28/]      This record does not distinguish the basis for counseling and is not therefore limited to patient abuse incidents.

of authority to replace departed or transferred white employees.  What he does not allege is that comparable white employees or other white candidates for employment sought these positions.

APPLICABLE LAW

Evidentiary Issues

As a threshold matter Dr. Hall has filed a motion to strike certain evidentiary submissions tendered by the defendants with the motion for summary judgment.  (Doc. #60).  The motion to strike also seeks to strike the "affirmative defense" through which the defendants contend that the plaintiff failed to avail himself of an effective policy or program to report racial harassment. ( *Id*.) Reanimated for the purposes of this order is Hall's motion to exclude (doc. #40) in which Dr. Hall asserts that the defendants wrongfully destroyed tape recordings that are "evidence" in this action.[29]

The motion to strike has three subparts.  First, Hall seeks to strike his own "unsworn" statements made during the September 5, 2002 Step 3 proceeding (doc. #58, defendants' exhibit 10); second, he challenges the conclusions reached by the defendants in their brief in support of their motion for summary judgment as related to certain evidence including the Investigative Review Panel report (doc. #58, defendants' exhibit 17); and finally, he seeks an order striking the affirmative defense frequently identified as *Ellereth/Faragher*.  (*See Burlington Industries, Inc. v. Ellereth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. Boca Raton*, 524 U.S. 777, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1988)).

Hall contends that the statements attributed to him in the transcript of the September 5, 2002 hearing is unsworn hearsay and inadmissible.  The law of this circuit is clear that out-of-court

---

[29]    The motion was denied without prejudice on September 29, 2005 on grounds that the tape recordings were not then material to the motion for summary judgment.   They are not but Dr. Hall is entitled to a ruling.

statements made by a witness are admissible under Rule 56(c) if the evidence is capable of being reduced to an admissible form at trial. *Macuba v. DeBoer*, 193 F.3d 1316, 1323 (11th Cir. 1999). As noted in *Macuba* the "reduced to admissible evidence at trial" language does not necessarily excuse unsworn statements. The Eleventh Circuit in *Macuba* discussed cases applying *Celotex* as "simply allowing *otherwise admissible evidence*" to be submitted in inadmissible form at the summary judgment state, though at trial it must be submitted in admissible form." (emphasis in *Macuba*). ( *Id.* at 1324). The court observed that an out-of-court statement might be admissible because it falls within the exception of the hearsay rule or perhaps because it does not constitute hearsay in that it is not offered for the truth of the matter asserted. It is only inadmissible hearsay that cannot be considered in a motion for summary judgment. *Home Oil Co., Inc. v. Sam's East, Inc.*, 252 F. Supp. 2d 1302, 1307 (M.D. AL 2003), *citing Macuba*, 193 F. 3d at 1322-24. Initially it must be observed that the statement Hall objects to as transcribed by a court reporter during the September 5, 2002 hearing was expressly ratified and adopted by plaintiff in his September 7, 2004 deposition. (Plaintiff's doc. #41, exhibit 5, Hall depo., p.129; see also fn 6, *supra*). The September 5, 2002 statement is incorporated into Hall's sworn deposition testimony.

As noted above, to be admissible at trial and therefore reducible to an admissible form, out-of-court statements generally must fall into one of the provisions of the Federal Rules of Evidence which establish that such statements are not hearsay or hearsay that is otherwise admissible pursuant to an exception. See *Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir. 1999); *Pritchard v. S. Co. Servs.,* 92 F.3d 1130, 1135 (1996). A statement by a party opponent is not hearsay and admissible under Federal Rule of Evidence 801(d)(2)(A). See *United States v. Munoz*, 16 F.3d 1116, 1120 (11th Cir. 1994) (noting that "a statement is not hearsay if it is a statement of a party against whom it is

offered).  Dr. Hall's unsworn testimony is admissible under 801(d)(2)(A) and in light of his express ratification of the statement, admissibility is further established by Federal Rule of Evidence 807. Hall himself provides the authentication of the statement.  *See Hill v. Manning*, 236 F. Supp. 2d 1292, 1297 (M.D. Ala. 2002) (applying F.R.E. 801(d)(2)).

Finally, it is of some significance that Hall has offered his own "unsworn statement" from the same September 5, 2002 proceeding by including a transcribed page of the statement of Dr. Travis Nobles.  (Doc. #41, plaintiff's exhibit 17).  Unlike Hall's own testimony, the unsworn testimony of Nobles does not appear to satisfy any hearsay exception within Federal Rule of Evidence 804(b)(1) nor is the indicia of reliability so facially apparent that the residual hearsay exception of Federal Rule of Evidence 807 is clearly applicable.

In that Hall's statement was expressly ratified by him in his sworn deposition and constitutes an admission of a party opponent the statement made on September 5, 2002 is properly before the court.  The motion to strike that statement is DENIED.

In his motion to strike Hall refers to the Investigative Review Panel minutes (defendants' exhibit #17) concluding, however, that it "may be admissible."  Indeed, the document is admissible. (See, e.g., Federal Rule of Evidence 803(5) & (6)).  Dr. Hall's challenge is less to the "evidence" than to the interpretation of that evidence as offered by the defendants in the accompanying brief. The brief is not evidence and the statements of counsel are not construed as evidence.  To the extent that the motion to strike is directed to the document itself (defendants' exhibit 17), the motion is due to be DENIED.  To the extent that the motion is directed to the defendants' interpretation of the exhibit the motion is MOOT.

22

Finally, Dr. Hall objects to the defendants' contention set out in the brief in support of the motion for summary judgment that:

> An employer may defend against these claims by showing that 1) it had installed a readily accessible and effective policy for reporting and resolving complaints of harassment; and 2) that the plaintiff unreasonably failed to avail himself of that process. [Citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)]

(Doc. #57 at p.9). In a response to Dr. Hall's motion to strike the defendants aver that their general answer at paragraph 48 the "defendants assert the plaintiff's complaint fails to state a cause of action upon which relief may be granted" (doc. #26) necessarily implicates the "usual defenses." It is, however, undisputed that the Eleventh Circuit has unequivocally stated that the *Ellereth/Faragher* process is an affirmative defense available to employers whose supervisors are charged with harassment.[30/] *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004). The general answer at paragraph 48 does not clearly raise the affirmative defense of *Ellereth/Faragher*. Hall contends that the defendants also raised a new defense that Bryce Hospital and the Department of Mental Health and Mental Retardation are not persons or entities subject to suit within the meaning of § 1983. This contention is simply wrong. The defendants have insisted upon that position from the filing of the first complaint through the second complaint and to the motion for summary judgment. (See ¶ 65 in the answer). Hall actually appears to contest the conclusion that the defendants are not persons within the meaning of 1983 rather than the timing of the presentation of the defense. (See doc. #60, motion to strike). The motion to exclude the affirmative defense of

---

[30/]      The defense is otherwise unavailable when a supervisor's official act precipitates a constructive discharge. *Suders*, 542 U.S. 129, 124 S.Ct. 2342, 59 L.Ed.2d 204.

*Ellereth/Faragher* is due to be GRANTED.[31] The motion to strike the "defense" that Bryce Hospital and the Department are not persons within the meaning of 1983 is due to be DENIED.

<u>Motion to Exclude–Spoilation</u>

Hall has contended that the tape recordings Thomas testified that she made during her investigation were destroyed or lost and that the destruction constitutes "spoilation of evidence." Hall also asserts erroneously that an order of this court was entered specifically protecting the tapes. The issue of Thomas's investigative report arose with the defendants' motion for a protective order. After a review of the law of privilege claimed by the defendants, the court directed that documents from Thomas's investigation of Hall be provided to the court for an *in camera* review. The court concluded that the plaintiff was entitled to discovery of certain documents and directed that they be provided. (Doc. #27). The court did not consider the question of tape recordings. At the time of Thomas's deposition and later that of Sawyer, the question of tape recordings was addressed. Hall has not cited any authority which would require the investigator to provide the tapes to Hall during the administrative proceedings with regard to his complaints.[32] While it is true that Hall demanded the tape recording before Thomas completed her report he does not demonstrate he had a right to them. The tapes like investigatory notes are not in and of themselves evidence. The evidence is the statement made by the witness. Despite repeated allegations of misconduct Hall has produced no

---

[31]     Hall's failure to report or complain about what he alleges to have been racial harassment is however material to a determination of his *prima facie* case notwithstanding the affirmative defense.

[32]     There is no *Jencks* Act, 18 U.S.C. § 3500, within the administrative process. Hall had the reports when he responded to the summary judgment motion. Hall could have called Thomas as a witness on September 5, 2002. Hall did depose Thomas and failed to develop even a scintilla of evidence that Thomas in some manner reported to her superiors something other than what she was told by witnesses. Hall also failed to produce any evidence that Thomas destroyed the recordings to conceal evidence. Indeed, the normal course of business seems to have been followed.

evidence that any statement attributed to a witness by Thomas was fabricated.  Hall knew who was interviewed and could have established such proof if it was present.

The tape recordings do not necessarily constitute evidence and were never subject to the protection of this court.  Hall is correct of course in his contention that sanctions may be imposed upon litigants who destroy documents while on notice that they are or may be relevant to a litigation or potential litigation or reasonably calculated to lead to discovery of admissible evidence.[33/]  In this circuit, however, an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated upon bad faith.  *Bashir v. AmTrak*, 119 F.3d 929 (11th Cir. 1997).  "Mere negligence in losing or destroying the records is not enough for an adverse inference, as it does not sustain an inference of consciousness of a weak case."  *Id*.  See also *Gratton v. Great American Communications*, 178 F.3d 1373 (11th Cir. 1999).  After careful review of the deposition testimony cited by the plaintiff, applicable law, the exhibits and all matters related to the motion to exclude (doc. #40), the motion is due to be and the same is hereby DENIED.

<u>SUBSTANTIVE LAW – GENERAL PRINCIPLE</u>

<u>Summary Judgment</u>

Summary judgment is available to the Alabama Department of Mental Health and Mental Retardation, Bryce Hospital, David Gay and Cathy Sawyer only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.  Federal Rule of Civil Procedure 56(c), *see Celotex Corporation v.*

---

[33/]     Thomas is not a litigant and there is no evidence of any kind that a party acted intentionally to destroy or hide evidence.

*Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The defendants, as the party seeking summary judgment "bear[s] the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided by trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coat & Clark, Inc.*, 927 F.2d 604, 608 (11th Cir. 1991; *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608.

The moving party can meet this burden by showing there is no dispute of material fact or by showing that Dr. Hall has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23, 106 S.Ct. 2548; see Federal Rule of Civil Procedure 56(a) and (b).  Once the defendants have met this burden, Rule 56(e) "requires the non-moving party to go beyond the pleadings and by ... affidavits or by the depositions, answers to interrogatories and the admissions on file, designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.  The non-moving party need not present evidence in the form necessary for admission at trial, however, the movant may not merely rest on the pleadings.

The substantive law will identify which facts are material and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2505.

<u>The Statutory Causes of Action</u>

Dr. Hall's amended complaint implicates three distinct statutory provisions each of which can give rise to a cause of action for racial discrimination affecting a public employee. His complaint sounds in Title VII, 42 U.S.C. § 1983 and 42 U.S.C. § 1981.

<u>Title VII Claims Generally</u>

The complaint alleges that the Alabama Department of Mental Health and Mental Retardation and Bryce Hospital are proper defendants in this action. To the extent the claims are made pursuant to 42 U.S.C. § 2000e-2(a), Hall is correct. In general "the Eleventh Amendment prohibits a federal court from exercising jurisdiction over a law suit against a state, except where the state has consented to be sued or waived its immunity or where Congress has overridden the state's immunity." *Lassiter v. Alabama A&M University*, 3 F.3d 1482, 1485 (11th Cir. 1993). It is undisputed that the Eleventh Amendment does not bar a Title VII action against a state agency. *Allen v. Alabama State Board of Education*, 816 F.2d 575, 577 (11th Cir. 1987). Individual defendants Cathy E. Sawyer and David E. Gay are not subject to individual capacity liability under Title VII. *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (holding individual capacity suits under Title VII are inappropriate. The relief available under Title VII lies against the employer not individual employees.)

<u>42 U.S.C. § 1983</u>

<u>Bryce–Department of Mental Health and Mental Retardation</u>

Title 42, United States Code, Section 1983 provides a broad remedy for violations of federally protected rights although the statute itself does not substantively create such rights. *Almand v. Dekalb County,* 103 F.3d 1510, 1512 (11th Cir. 1997). Section 1983 provides that "[e]very

*person*" who, acting under color of state law, violates another's federally protected rights "shall be liable to the party injured."  42 U.S.C. § 1983 (emphasis added).  In *Will v. Michigan Department of State Police*, 491 U.S. 58, 70-71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court held that entities with Eleventh Amendment immunity, including states and state agencies, are not "persons" subject to liability under § 1983.  *See also Howlett v. Rose*, 496 U.S. 356, 365, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1980) ("*Will* establishes that the state and arms of the state ... are not subject to suit under § 1983 in either federal or state court.").  Whether a state agency or department is "an arm of the state partaking of the state's Eleventh Amendment immunity turns on its function and characteristics as determined by state law."  *Sessions v. Rusk State Hospital*, 648 F.2d 1066, 1069 (5th Cir. 1981).  An action against the Alabama Department of Mental Health and Mental Retardation is an action against the state of Alabama.  *Cross v. State of Alabama, State Department of Mental Health and Mental Retardation*, 49 F.3d 1490, 1503 (11th Cir. 1995).  Moreover, actions against the director of the Department or the director of the Bryce facility in their official capacities for damages are also barred by Eleventh Amendment immunity.  *See Carr v. City of Florence, Alabama*, 916 F.2d 1521, 1525 (11th Cir. 1990).[34/]  A review of the statues provided by the defendants establish that Bryce Hospital, like the Alabama Department of Mental Health and Mental Retardation, is an arm of the state for the purposes of 1983 liability for damages.

Sawyer and Gay § 1983 Individual Liability

A plaintiff who sues an individual under § 1983 "seek[s] to impose personal liability upon a government official for actions he takes under color of state law."  *Kentucky v. Graham*, 473 U.S.

---

[34/]     An action against Sawyer and Gay or Gay's successor for prospective injunctive relief is not considered an action against the state.  An Eleventh Amendment immunity does not insulate an official capacity defendant from actions seeking only prospective, injunctive relief.  *Lassiter*, 3 F.3d at 1485.

159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). State officials are immune from liability in their individual capacities under § 1983 unless their actions violate legal norms that are clearly established at the time of the challenged action. *Lassiter v. Alabama A&M University,* 28 F.3d 1146, 1150 (11th Cir. 1994). See also *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)(holding that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand what he [or she] is doing violates that right.") *See also Hope v. Pelzer*, 535 U.S. 730, 739, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002). Absent controlling authority, a plaintiff can overcome qualified immunity only when "the official's conduct lies so obviously at the very core" of what the Constitution forbids "that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997) (citing *United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)). "This is not to say that an official is protected by qualified immunity unless the very action in question has previously been held unlawful, but is to say that in light of pre-existing law, the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. In determining the state of the law the district court must look to "the law originating in [the Eleventh] Circuit, as well as the Supreme Court, the courts of appeals and the district courts." *Leeks v. Cunningham*, 997 F.2d 1330, 1333 (11th Cir. 1993). Moreover, individual liability for a supervisor lies under § 1983 only when the named supervisor personally participates in the alleged violation or when the supervisor's actions are causally connected to the alleged violation of federal statutory or constitutional law. *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Vicarious liability or liability as a product of *respondeat superior* cannot be used to hold supervisory officials liable under § 1983 for the conduct of subordinates. See *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). Moreover,

29

in a 1983 action where government officials are sued in their individual capacities and have raised the defense of qualified immunity the Eleventh Circuit has "tightened" the pleading requirements. *GJR Investments, Inc. v. County of Escambia, Florida*, 132 F.3d 1359, 1367 (11th Cir. 1998.  In *Oladeinde v. City of Birmingham*, the Eleventh Circuit held that in cases where qualified immunity is implicated "some factual detail is necessary, especially if [the court is] to be able to see that the alleged violated right was clearly established when the alleged wrongful acts occurred."  93 F.2d 1481, 1485 (11th Cir. 1992).[35/]

42 U.S.C. § 1981

Dr. Hall asserts claims pursuant to 42 U.S.C. § 1981 in addition to his § 1983 claims.  Both Dr. Hall's Title VII and § 1981 claims have the same requirements of proof and use the same basic analytical framework.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  *See also Embry v. Callahan Eye Foundation*, 147 Fed. Appx. 819, n.1 (11th Cir. 2005).  Moreover, when defendants are state actors as here, a plaintiff's § 1981 claims merge into his § 1983 claims and courts are required to treat the claims as "a single claim."  See *Godby v. Montgomery County Board of Education*, 996 F. Supp. 1390, 1411 (M.D. Ala. 1998); *see also Moore v. State of Alabama*, 989 F. Supp. 1412, 1420-21 (M.D. Ala. 1997), *aff'd*, 178 F.3d 1303 (11th Cir. 1999).  As explained by the Eleventh Circuit "[t]he Supreme Court has ruled that 'the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.'"  *Pearson v. Macon-Bibb County Hospital Authority*, 592 F.2d

---

[35/]     This specificity requirement is not applicable in the Title VII context in part because there is no individual liability.

1274, 1278 n.3 (11th Cir. 1992) (*quoting Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).[36/]

Title VII–1983 General Principles

Hall presents two basic theories which underlie his Title VII cause of action.[37/]  First, he contends that he was subjected to a racially hostile work environment which ultimately caused him to resign his position.  Second, Hall contends that he was treated less favorably than African-American employees because of his race during the relevant period of his employment.[38/] To prove a *prima facie* case of hostile work environment harassment under Title VII, Hall must show that: (1) he is a member of a protected group; (2) he was subjected to unwelcome conduct; (3) the conduct was on the basis of his race; (4) the conduct affected a term or condition of employment; and (5) imposition of liability on the named defendant is appropriate.  *Underwood v. Northport Health Servs., Inc.*, 57 F. Supp.2d 1289, 1301 (M.D. Ala. 1999) (Thompson, J.).  A hostile work environment claim under Title VII is established upon proof that "the work place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).  The Eleventh

---

[36/]     The merger affect of the 1981 and 1983 claims does not require the dismissal of either.  The law merely requires that the 1981 and 1983 claims be considered together.  For that reason the 1981 analysis of Dr. Hall's claim will subsumed in the 1983 discussion set forth below.

[37/]     A hostile work environment once established is a tangible employment action as is disparate treatment on conditions of employment including discipline.  The conduct would, if proven, satisfy Title VII or § 1983.  In this sense a hostile work environment is a way of proving a tangible employment action.  A disparate treatment claim must also include proof of a tangible employment or adverse employment action.  Each "claim" is a method of proving intentional racial discrimination.  *Hulsey*, 367 F.3d at 1246.

[38/]     As a discrete matter, Hall's procedural due process claim arises only in the context of § 1983.

Circuit has repeatedly instructed that a plaintiff attempting to demonstrate a hostile work environment must demonstrate *inter alia* that the harassment was based upon the protected characteristics of the employee such as race and that the harassment was sufficiently severe or pervasive to alter a term or condition of employment creating a discriminatorily abusive working environment. *Mendoza v. Borden*, 195 F.3d 1238, 1245 (11th Cir. 1990). To determine whether the harassment was severe and pervasive enough to alter the terms and conditions of employment, the court is required to consider: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Allen v. Tyson Foods,* 121 F.3d 642, 647 (11th Cir. 1997) (*citing and applying Harris*, 510 U.S. at 23, 114 S.Ct. 367). In addition the employee must satisfy both an objective and subjective test. *See Mendoza*, 195 F.3d at 1246. The employee must establish not only that he subjectively perceived the environment as hostile but that a reasonable person would perceive the environment to be hostile and abusive. *Watkins v. Bowden,* 105 F.3d 1344, 1355-56 (11th Cir. 1997). The objective severity of the harassment must be judged from the prospective of a reasonable person in the employee's position, considering all of the circumstances. *Id*.

The Constructive Discharge Claim

To maintain a constructive discharge claim predicated on a hostile work environment, Hall must demonstrate that the working conditions were "so difficult ... that a reasonable person would have felt compelled to resign." *Pipkins v. City of Temple Terrace*, *Florida*, 266 F.3d 1197, 1201 (11th Cir. 2001) (internal quotation marks and citations omitted). "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Hipp*

*v. Liberty National Life Insurance Co.*, 252 F.3d 1208, 1231 (11ᵗʰ Cir. 2001).  *See also Poole v. County Club of Columbus, Inc.*, 129 F.3d 551, 553 (11ᵗʰ Cir. 1997).  The question is always whether there was race discrimination not merely conditions a plaintiff finds hostile.

The Disparate Treatment Claim

The appropriate framework from which to evaluate Dr. Hall's claim of disparate treatment in the absence of direct evidence of racial discrimination is the familiar burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  Under this framework Dr. Hall bears the initial burden of establishing a *prima facie* case of discrimination.  *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1824.

In *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11ᵗʰ Cir. 1999), the Eleventh Circuit required that, "[t]o establish a *prima facie* case of disparate treatment, appellant must show: (1) she [he] was a member of a protected class; (2) she [he] was subjected to an adverse employment action; (3) her [his] employer treated similarly situated male [African-American] employees more favorable; and (4) she [he] was qualified to do the job."  If a *prima facie* case is demonstrate then, but only then, the defendant must "articulate some legitimate, non-discriminatory reason for the [adverse employment action]." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.  Once the defendant satisfies this exceedingly light burden the plaintiff is then required to demonstrate the proffered reason was merely a pretext for racial discrimination.  See *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1089.  Unquestionably "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the defendant remains at all times with the plaintiff."  *Id*.

It is important to recognize that when demonstrating a *prima facie* case Hall is required to prove that persons not members of the protected class received dissimilar, that is, better treatment. *See Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir. 1989). To meet this burden Hall must prove that he and non-protected persons, in this case African-American employees, "are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). To prove that Hall was treated less favorably than similarly situated individuals outside of the protected class "evidence that similarly situated employees are disciplined more leniently is admissible to support a disparate treatment claim." *Anderson v. BMG-42*, 253 F.3d 561, 564 (11th Cir. 2001). Employees are similarly situated when "the comparator employees are involved in or accused of the same or similar conduct yet are disciplined in a different, more favorable manner." ( *Id.*, quoting *Holifield v. Reno*, 115 F.3d at 1562.). "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges." *Maniccia*, 171 F.3d at 1368. In the event Hall cannot demonstrate that he suffered an adverse employment action or that he was treated less favorably than similarly situated individuals outside of his class, he will not establish the required rebuttable presumption under *McDonnell Douglas* which when present obligates the defendant to offer reasons for the challenged action. *Maynard v. Board of Regents of Division of Universities of Florida Department of Education.*, 342 F.3d 1281, 1289 ( 11th Cir. 2003); *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1824.

Section 1983–Procedural Due Process

An individual's right to procedural due process is rooted in the Fourteenth Amendment to the United States Constitution which protects against deprivation of life, liberty or property without

due process of law.  In the context of public employment, if an individual has a property right in continued employment the state cannot deprive him of that property without due process.  *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985).  In general, a property right is a right that is created by state law.  *Board of Regents v. Roth*, 408 U.S. 564, 577-78, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).  If considered an at will employee under Alabama law, the Eleventh Circuit law is clear that there is no property interest and no corresponding right to process.  *Green v. City of Hamilton Housing Auth.,* 937 F.2d 1561, 1564 (11th Cir. 1991).  However, under more limited circumstances a plaintiff may also demonstrate that he was deprived of a liberty interest separate from an employment property interest.  Although damage to one's reputation standing alone will not provide a basis for an action under § 1983 reputational damage sustained in connection with the termination of employment may give rise to a procedural due process claim for deprivation of liberty which is actionable under § 1983.  *See Campbell v. Pierce County, Georgia*, 741 F.2d 1342, 1344 (11th Cir. 1984) (citations omitted).  *See also Cotton v. Jackson*, 216 F.3d 1328, 1330 (11th Cir. 2000).  To recover, a plaintiff asserting such a due process right must satisfy a six-factor test and demonstrate that "(1) a false statement, (2) of stigmatizing nature, (3) attending a governmental employee's discharge, (4) [was] made public, (5) by the governmental employer, (6) without a meaningful opportunity for an employee name clearing hearing."  *Warren v. Crawford*, 927 F.2d 559, 565 (11th Cir. 1991) (*quoting Buxton v. City of Plant City, Flor.,* 871 F.2d 1037, 1042-43 (11th Cir. 1989)).  The process requirement is satisfied if a hearing is held either before or after the termination or publication.  *See Harrison v. Wille*, 132 F.3d 679, 683 n.9 (11th Cir. 1998).

35

Regardless of the underlying interests, in order to establish a violation of procedural due process Hall must show (1) that he was deprived of a property or liberty interest by the state and (2) that he did not receive sufficient process regarding that deprivation. *Ross v. Clayton County, Georgia*, 173 F.3d 1305, 1307 (11th Cir. 1999).  In determining whether the process provided to a plaintiff was constitutionally adequately, courts merely examined the procedural safeguards built into the statutory or administrative procedure affecting the deprivation and any remedies for erroneous deprivations provided by statute or state tort law. *Zinermon v. Burch*, 494 U.S. 113, 126, 110 S.CT. 975, 983, 108 L.Ed.2d 100 (1990).  For example, when an employee is terminated he is entitled to "some kind of hearing" prior to termination. *Loudermill*, 470 U.S. at 542, 105 S.Ct. at 1493.  Such a proceeding requires only oral or written notice of the general nature of the charges against him and an explanation of the employer's evidence in an opportunity to present his side of the story. *Id.* at 546, 105 S.Ct. at 1495.  Such a hearing need not be a full evidentiary proceeding nor does it need to definitively resolve the propriety of the discharge.

As a matter of constitutional analysis, the allegation of the plaintiff that the defendants' violated their own personnel policies or procedures does not establish a constitutional violation.  The Eleventh Circuit has explained that merely because a state law procedure exists does not mean that a violation of the specific procedure is a due process violation under the federal Constitution. *Harris v. Birmingham Board of Education*, 817 F.2d 1525, 1528 (11th Cir. 1987).  *See also Black v. City of Auburn*, 857 F. Supp. 1540 (M.D. Ala. 1994) ("Non-compliance with personnel policies is not a *per se* denial of procedural due process."), *aff'd*, 56 F.3d 1391 (11th Cir. 1995); *Ray v. Birmingham City Board of Education*, 845 F.2d 281, 283 (11th Cir. 1988).

A deprivation of procedural due process "is not complete unless and until the state refuses to provide due process." *Zinermon,* 495 U.S. at 126, 110 S.Ct. at 983.  In other words, a plaintiff does not suffer a violation of procedural due process rights unless and until the state refuses to make available the means to remedy the deprivation. *McKinney v. Pate,* 20 F.3d 1550, 1563 (11th Cir. 1994).  If a state remedy "could have fully compensated the employee for the property loss suffered," it satisfies procedural due process if the employee did not avail himself of it.  *Id.* at 1564-65. (citations omitted).  This includes the remedial process that state courts could provide if they were asked. *Horton v. Board of Commissioners of Flagler County,* 202 F.3d 1297, 1300 (11th Cir. 2000).

A § 1983 procedural due process claim may be resolved on the grounds that the state provides for a post-deprivation remedy independent of § 1983.  *Tinney v. Shores*, 77 F.3d 378, 381-82 (11th Cir. 1996).  *See also Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) and *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).  When the challenge to procedural due process is predicated upon an "as applied theory" the procedural due process violation does not become actionable until the state refuses to provide due process.  See *Bell v. City of Demopolis*, 86 F.3d 191, 192 (11th Cir. 1996) (Distinguishing between a challenge to the state procedure itself and a challenge to the state procedure as applied).  An allegation by a plaintiff that the employer has violated its own procedures for termination or review falls within *Parratt/Hudson* and a plaintiff is required to demonstrate that the state court has denied a post-deprivation remedy including access to state courts.  A challenge made exclusively to an allegedly unauthorized action of state officials will not establish a procedural due process violation if the state affords a post-deprivation remedy.

DISCUSSION – ANALYSIS APPLICATION OF LAW TO FACT

Title VII and Section 1983 Hostile Work Environment

In any employment discrimination action the primary issue is whether the employer intentionally discriminated against the employee because of his race. *See U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). (In the context of gender discrimination the 1983 and Title VII analysis for race and gender discrimination are identical). A *prima facie* case of racial discrimination based upon a hostile work environment is established when a plaintiff establishes that he was subjected to harassment and the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment. *Mendoza v. Borden, Inc.*, 195 F.3d at 1245. To be successful, "a plaintiff must establish not only that [ ] he subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000). Finally, "[t]o constitute an actionable hostile work environment the conduct must be objectively sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21, 114 S.Ct. 370 (*quoting Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). It is the fourth element, conduct sufficiently severe or pervasive to alter conditions of employment – "that tests the mettle of most harassment claims." *Gupta*, 212 F.3d at 583. A court is required to examine the conduct in combination, not isolation, to determine, under a totality of the circumstances test, "whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of a plaintiff's employment and to create a hostile or abusive working environment." *Mendoza*, 195 F.3d at 1246. *See also Johnson v. Booker T. Washington Broadcast*

*Servs., Inc.*, 234 F.3d 501 (11th Cir. 2000).   As mentioned above, determining whether the harassment is objectively sufficient the court addresses the frequency of the conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance and whether the conduct reasonably interferes with an employee's job performance. *Allen*, 121 F.3d at 647.[39/] In considering a hostile work environment claim a court may consider a series of acts to aggregate otherwise unactionable events to demonstrate a discriminatory intent.   In that respect, "a hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'lawful unemployment practice.'" *Shield v. Ft. James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002).

Dr. Hall's EEOC complaint stated that

> Since April 2002, I have been subjected to ... conditions of employment with respect to having to work in a racially hostile work environment.  I have had my medical decisions questioned by black mental health workers and black nurses with no medical degrees and overturned by the administrator, who has no medical expertise.  The administrator has accepted undocumented complaints and initiated investigations against me for unwarranted reasons.  In addition, my job was threatened because I would not perform unethical practices and procedures which would have resulted in malpractice lawsuits. The environment became so hostile that I took leave starting June 28, 2002 and gave notice July 8, 2002 that I was resigning effective August 9, 2002.

(EEOC discrimination charge, doc. #41, Exhibit F).

Dr. Hall's hostile work environment claim is predicated on his contention that (1) he was wrongfully investigated for patient abuse, (2) after that investigation his report of an abuse of patient's rights

---

[39/]   The analytical foundations for a hostile work environment claim has its origins in the sexual harassment context. For that reason, courts adjudicating a hostile work environment claim in the racial context typically turn to sexual hostile work environment cases for analogous principles. *3 Lex Larson, Employment Discrimination,* § 52.02 at 52-4 (2d Ed. 2000).

violation were ignored and that during that incident Joe Stringer made comments Hall felt were "demeaning" and (3) that Hall's medical judgment with respect to patient transfers was not sought or if sought was ignored.  No where in his recitation of factual allegations does Hall identify the severe racially charged atmosphere that is the *sine qua non* of a hostile work environment.  Whether Hall actually subjectively viewed these individual acts as racially discriminatory is itself suspect.[40]/ Hall's allegations appear to establish that he was more offended by a challenge from persons with inferior medical credentials with regard to his conduct in transporting T.W. on April 2, 2002 than he was offended because of racially derogatory comments or conduct.  If it is assumed however that Dr. Hall subjectively viewed the investigation and the other alleged incidents as discriminatory, an objective view of the incidents will not establish a *prima facie* case under either Title VII or section 1983 of a hostile work environment.  The alleged conduct took place only between April 2 and June 28, 2002.  No racial epithets were involved, no physically threatening nor objectively, humiliating incidents occurred.[41]/ The conduct affecting Hall's job performance was not racial, but administrative or medical.[42]/ Hall's conclusion that Stringer's statement on June 6, 2002 that Gay was "pissed" at him while crude is not demeaning within the meaning of Title VII.  That statute is not a general civility code.  *Gillis v. Georgia Dep. of Corrections*, 400 F.3d 883, 888 (11th Cir. 2005). (Recognizing that Title VII is "neither a general civility code nor a statute making actionable the

---

[40]/     Here it is material that Hall did not report to anyone but Nobles his claims of racial discrimination and never availed himself of the Department's procedure for such complaints.  This is of particular significance if it is accepted as true that Hall's supervisor refused to act to correct the conditions.

[41]/     Hall does state in his affidavit that David Gay is a large African American male.  He avers that he felt physically intimidated when he was around Gay.  That statement, however, is irrelevant to whether he was in fact threatened or humiliated by Gay.  He has offered no evidence to suggest that he was.

[42]/     Indeed, Hall does not even actually suggest that all of his decisions with regard to patient transfers were predicated upon medical needs.  As noted above, at least one of the transfers Hall ordered was based upon the potential closing of One-North.

indecency tribulations of the workplace.")  The investigation of Hall's April 2, 2002 conduct was initiated by Kim Sturdivant, a white female.  The participants in the Investigation Review Panel were African-American and Caucasian.  The participants in the treatment planning conference interviewed by Investigator Tucker were Caucasian and African-American.  While Dr. Hall may have considered his employment conditions to be hostile after April 2, 2002 he has produced no evidence that the hostility was racially motivated.  He has also failed to establish that the hostility, if any, was severe and frequent enough to affect a condition of employment.  The defendants are entitled to summary disposition of the hostile work environment claim.

<u>The Disparate Treatment Claim</u>

The defendants acknowledge that a disparate treatment claim is established when a plaintiff demonstrates that (1) he is a member of the protected class; (2) he was subjected to an adverse employment action; (3) that his employer treated similarly situated African-American employees more favorably and (4) he was qualified to do the job.  *EEOC v. Jones Stone Crab, Inc.*, 20 F.3d 1263, 1286 (11th Cir. 2000).  It is undisputed for the purposes of this order that Hall is a member of a protected class and that he was qualified to perform his job.  The defendants appear to contend that Hall was not subjected to an adverse employment action because he received only a counseling letter. The Eleventh Circuit has "not adopted a bright line test for what kind of effect on the plaintiff's 'terms, conditions or privileges' of employment the alleged discrimination must have for it to be actionable." *Davis v. Town of Lake Park, Florida*, 242 F.3d 1232, 1238 (11th Cir. 2001). Although the Eleventh Circuit has clearly stated that "not all conduct by an employer negatively affecting an employee constitutes an adverse employment action." ( *Id.*) Indeed, "[a]lthough the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative

41

and must at least have a tangible adverse affect on the plaintiff's employment." *Id*. at 1239.  Thus, Hall "... must show a *serious and material* change in the terms, conditions, or privileges of employment." *Id*. (emphasis in the original). Moreover, "... the employees subjective view of the significance and the adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id*.  In *Davis* the Eleventh Circuit concluded that a memoranda which did not constitute a "formal" reprimand did not result in the plaintiff suffering any tangible consequences and would not constitute "adverse employment actions."  The court concluded that "criticisms of an employee's job performance – written or oral – that do not lead to tangible job consequences will rarely form a permissible predicate for a Title VII suit." *Id*. at 1241.  However, the absence of a bright line test also requires the court to determine whether in the particular case an action that is other benign may constitute an adverse employment action.  The Supreme Court has observed that an employee may have a liberty interest with respect to his reputation in the community.  As to Dr. Hall, the counseling letter which is predicated upon a finding of patient abuse is sufficiently related to the performance of his professional tasks that it cannot be said he has failed to demonstrate an adverse employment action based upon the disciplinary finding.[43]/  For the purposes of this order the court finds that there is an adverse employment action.  Hall's remaining task is to demonstrate that in the matters of discipline founded upon patient abuse, similarly situated African-American employees were treated differently than the plaintiff.  He has simply offered no evidence to support that conclusion.  Indeed, the evidence that he offers with respect to disparate treatment is based exclusively upon his own affidavit contending that other white employees were treated unfairly.  He does not proffer a

---

[43]/      What he has not demonstrated, however, is that the disciplinary was predicated upon a racial animus.

comparison of any African-American employee remotely similarly situated to himself.   The comparisons he attempts to make regarding other white employees are both conclusory in nature and critically deficient in that the requisite similarities of position and dissimilarity of treatment are not identified.   If two employees are not similarly situated, the different application of disciplinary rules will not constitute any illegal discrimination under Title VII.   *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) (stating that "not everything that makes an employee unhappy is an actionable adverse action.") The plaintiff's conclusory allegations are simply not enough.   *See Celotex*.   Moreover, Hall's underlying premise is that because he did not believe that his conduct constituted patient abuse his disciplinary sanction was illegal.   Neither Title VII nor § 1983 provide for such relief.   An employer may take any employment action based on erroneous facts or indeed for no reason at all so long as the action is not taken for a discriminatory reason.   *Damon v. Fleming Supermarkets of Florida, Inc.*, 195 F.3d 1354, 1305 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee has violated a work rule is not liable for discriminatory conduct.")

Hall's claim that Dr. Lawson received a benefit denied to him fails to make the necessary comparison.   Hall does not say who made the decision concerning Lawson or why.   He does not say he asked anyone other than Nobles for a four day work week.   If Nobles granted the four day work week to Lawson then neither Gay nor Sawyer could have discriminated against Hall.   The record establishes only that Nobles, a white male, did not give Hall what he wanted.

Hall cannot make a *prima facie* case of racial discrimination based on disparate treatment in the work place.

43

<u>The Constructive Discharge Claim</u>

Proof of a constructive discharge requires a quantum of proof greater than that of necessary to establish a hostile work environment.  Dr. Hall cannot establish a *prima facie* case of hostile work environment.  As a matter of law Hall cannot sustain a constructive discharge claim.

<u>Section 1983 Individual Liability Claims</u>

The analytical framework for Title VII and 1983 claims with respect to Bryce Hospital and the State of Alabama are identical.  It is unnecessary to determine whether the state agencies are subject to suit under 1983 in that Hall cannot establish a *prima facie* case under Title VII.  As set out above, however, Bryce Hospital and the Department are in fact immune from such suit.  In the absence of proof of a *prima facie* case neither Gay nor Sawyer, individually, can be subject to § 1983 or § 1981 liability.  However, particularly with respect to defendant Sawyer Dr. Hall has not produced a scintilla of evidence which would result in individual liability under a hostile work environment or disparate treatment framework.  Sawyer is entitled to summary disposition of both claims alleging vicarious supervisor liability.  Gay is not liable for the alleged conduct of any other employee.

<u>Section 1983 Procedural Due Process Claims</u>

Assuming that Dr. Hall has a recognizable constitutional liberty interest in his reputation, a fact which is not clearly established, his due process rights at this juncture have not been abridged.[44/] Hall essentially asserts that his due process claim is proven because the defendants have "admitted"

---

[44/]    An injury to reputation which provides the underpinning for a liberty interest cognizable under the due process and equal protection clause of the Fourteenth Amendment requires publication of a false statement by the defendants.  The defendants have never published their findings.  The only evidence in the record related to a publication is Hall's admission that he informed University of Alabama Hospital officials of the investigation.  The court is not required however to determine whether Hall has a constitutionally cognizable liberty interest in that his due process rights under the Fourteenth Amendment have not been abridged.

that they have failed to adhere to their own procedural rules.  For the reasons set forth in the preceding discussion even if Hall's assertion is found to be true he does not state a constitutional cause of action under 1983.  As a factual matter, while Hall insists he has been "denied" a Step 4 hearing before the Commissioner, he does not dispute that such a hearing was in fact scheduled for October 31, 2002 and continued for several months at his own request.  The Commissioner's decision, following advice of counsel, to defer the Step 4 hearing until the resolution of this litigation does not constitute a refusal to provide due process.  The gravamen of the due process claim as a matter of constitutional wrong is whether state remedies, whether administrative or judicial, are unavailable to Hall because the state has refused to provide due process.  *McKinney v. Pate*, 20 F.3d 1563.  The remedies available to Hall have the same vitality today that they did in October 2002 when the Step 4 hearing was originally set and May 2003 when this litigation led to the decision to defer the hearing.  Hall has not been denied constitutional procedural due process within the meaning of the Fourteenth Amendment.

<u>FINDINGS</u>

The defendants are entitled to summary judgment on all claims made pursuant to Title VII, 42 U.S.C. § 1983 and 42 U.S.C. § 1981.  The defendants' motion for summary judgment (doc. #57) is GRANTED.  Plaintiff's motion to exclude (doc. #40) is DENIED.  Plaintiff's motion to strike (doc. #60) is GRANTED IN PART and DENIED IN PART.  A separate Judgment consistent with this Memorandum of Opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 24th day of March, 2006.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE